James R. Allison et al., Appellants, v. William L. Berry and Jack Woods, Appellees.

Heard in this court at the May term, 1942. Opinion filed November 2, 1942.

CONGER & ELLIOTT, of Carmi, and H. C. MOORE, of Centralia, for certain appellant; H. C. Moore, of Centralia, of counsel.

KERN, PEARCE & PEARCE, of Carmi, and KELLY A. LOY, of Fairfield, for appellees.

MR. JUSTICE BRISTOW delivered the opinion of the court.

On January 18, 1940, Plaintiffs filed their complaint in equity to have two oil leases on certain lands executed to appellee, William L. Berry, and to one Frank Denker, canceled, and for injunction. Appellees filed a counterclaim for damages for instituting said suit and for the execution and filing of record of another oil lease, on the same lands by plaintiffs, James R. Allison and Ida M. Allison to plaintiff Oil, Inc., a corporation. The chancellor found in favor of defendants and counterclaimants, and entered judgment for counterclaimant, William L. Berry in the sum of $529 and counterclaimant, Jack Woods, in the sum of $350 against the plaintiff, Oil Inc., a corporation. Counterclaimants dismissed their counterclaim against the other two plaintiffs, James R. Allison and

Ida M. Allison. Oil, Inc., a corporation, has appealed from said judgments.

On July 9, 1939, the Allisons executed an oil lease on said lands to defendant Berry and said Frank Denker. This lease provided that if no oil well was completed on or before January 5, 1940, the lease should terminate. When December 11, 1939 came, no well had been completed or drilling or work of any kind begun under said lease. On December 11, 1939, the Allisons executed to Berry and Denker another oil lease on the same land, which provided that, if no well be commenced by them on or before December 31, 1939, the lease should terminate and provided that the well should be drilled with all due diligence. Berry acquired Denker's interest in the lease except a thirty-first part.

On December 20, 1939, Jack Woods and Berry entered into a contract between themselves whereby Woods agreed to drill an oil well on said land for Berry.

On December 23, 1939, on said lands and at labor cost of $3.50, a small excavation was made. On December 26, or 27th, 1939, a derrick was hauled and erected upon said land and between January 3 and 5, 1940, a slush pit was dug. This work was done for Woods. On January 11, 1940, Allison served Berry with notice of forfeiture of his leases and erected ''No trespassing'' signs on the premises. After the service of such notice of termination of the Berry leases, Allison executed the lease in question to the appellant, Oil, Inc., a corporation, on the same lands, by which lease it agreed to complete an oil well in 30 days. This last lease was placed of record and counterclaimants claim damages therefor, on the theory of slander of title.

After the lease was executed to appellant and about nine o'clock p.m. of the same day, agents of Berry and

Woods broke down the fences on said lands and drove a truck on same and unloaded a set of draw heads. About a week later other equipment was hauled and unloaded on the premises. No engines or boilers were ever brought on the land. No other work was ever done and several weeks later, appellees removed such equipment from the premises.

It is quite apparent from the undisputed evidence that from December 11, 1939 to January 11, 1940 and after that date, that Allison was becoming more and more disturbed with the fear, and prospect, of no early beginning of actual drilling of an oil well on said premises. He claimed that Berry advised him that he had contracted with certain contractors, and thereby he secured the lease agreement of December 11, 1939, although he had done nothing under his lease dated July 9, 1939. The evidence showed that the weather was cold and snow was on the ground. It further showed that in the near vicinity at least five other oil wells were being drilled and were continued, to completion.

About the first of January, appellant, Oil, Inc., a corporation, was ready to take a lease from Allison and pay him $600 for same and to agree to put an oil well down in 30 days. Although there were several conferences between representatives of appellant and Allisons, the latter did not at first give such lease to appellant, saying that he was going to give Berry one more chance. And after he had given notice to Berry to move out, he did not execute a new lease, although requested, for some time. The evidence shows that Oil, Inc., a corporation, did nothing more than offer to accept a lease from the Allisons. No bad faith on its part or on the part of the Allisons appeared. Appellant did not move its machinery on the land or start to drill a well. The continued possession of premises by Berry and Woods prevented Oil, Inc., a corporation, from moving its machinery on the land.

Allison was continually appealing to Berry to start operations. There is nothing in the evidence to show that Allison was a conspirator or entered into a conspiracy with Oil, Inc., a corporation. The counterclaim was dismissed against Allisons after evidence was introduced.

Berry and Woods testified that to January 18, they were financially able to drill a well and pay for expense of drilling of same. Berry said the Allison lease was suitable for drilling and was a good drilling lease and that the lease was as good at the hearing as it was when he was moving on the premises. When the court asked him during the trial if he would drill the well then, if there was no question about the title, he said he had had so much bad luck since, that he wouldn't say he was financially able to drill the well.

Woods was never able to secure the proper drilling equipment. He had a steam outfit which was not suitable for cold weather, since pipes had not been put under the ground before it got cold. He tried to get a Diesel outfit which was a proper one, but was unsuccessful. The evidence is conclusive that it was almost the end of December before Berry, through Woods, became active in getting ready to proceed with the work. No casing was put down as the lease required. It was to be expected that the weather would get cold. The proposed machinery was unsuitable for the purpose, in cold weather. It was apparent to Allison that appellees could not, under all the circumstances, develop the lease in question until warmer weather. Bad weather was no excuse for nonperformance.

The elements of damages allowed by the court in its two judgments was damages of Wood alone. The judgment in favor of Berry was for an expense of the contractor Woods which Berry, as an accommodation to Woods had occasioned, *viz.*, digging of a small cellar hole at cost of $3.50 and slush pit at cost of $75.

Woods was allowed $50 he paid an attorney for drawing up his drilling contract and $300 for truckers moving equipment on the ground after notice had been served that the lease had been forfeited. Woods had never spoken a word in his life to the Allisons and if he did not know of the notice to cancel the lease, it was because Berry, for whom he was contracting to drill a well, did not tell him. But the signs of ''No trespassing'' were visible.

Woods had no title, yet appellees claimed and the court allowed some of the items of damages to a contractor, who was a stranger to the title. The recourse of Woods, if any, was against Berry, had Berry breached his contract with Woods.

The counterclaim recited execution of the leases; alleged Berry and Woods commenced a well on December 26, 1939, that they had made financial arrangements for its completion and contracted for the equipment with which to drill it; that plaintiffs wilfully conspired to defeat their lease; that Allison executed said lease to Oil, Inc., a corporation, who accepted same and thereby clouded the title of counterclaimants so they were unable to continue drilling; that in addition to granting the lease, plaintiffs brought this suit to cancel their lease and as a result counterclaimants have been unable to secure funds to complete said well and that their contractor refused to furnish the drilling equipment with which to drill same; that appellant has completed a dry hole in the vicinity which tends to condemn their lease and that it is very doubtful if counterclaimants can refinance their drilling, and, as a result of the conspiracy, counterclaimants have been damaged.

Appellees contend that a freehold is involved and that this case should have been taken directly to the Supreme Court. Allison served notice of termination of the Berry lease. During the trial Berry tendered release of these leases. It seems to us that by such

mutual action, the leases were terminated, and that a freehold is not now involved; that the issue involved is upon the counterclaim, for damages.

The injury complained of in the counterclaim was loss of credit; but it averred that financial arrangements had been made for drilling the well. The testimony of Berry indicated that he was worth several thousand dollars. Just why he did not use his assets and proceed, was not made clear. Woods testified that he was financially able to drill the well. Berry and Woods did no further work than as herein stated. They were not stopped by this litigation. No injunction was issued. If litigation stops a lessee, he still has the right, thereafter, to continue and complete a well. Summers Oil & Gas, vol. 2, p. 261, sec. 349; *Greer v. Carter Oil Co.*, 373 Ill. 168, 177, 178.

It seems apparent from the evidence, counterclaimants quit because they were afraid that the notice of forfeiture of their lease might. be valid, and, that should they proceed, they might work on a well, to the advantage of someone else. Such situation faces every person against whom some other person may assert a right. No facts were shown of any effort to obtain any credit or financing or make financial arrangements after the notice of forfeiture was served. There was no attempt by Berry to sell his lease or borrow money on same. Berry admitted his lease had a commercial value, that it was in proved territory, that the values of such leases in oil fields depend upon the surrounding wells and that this was in good territory.

The items of expense of Woods for which the two judgments were allowed, were all contemplated in the drilling of the well under the lease, and had Woods continued the work and drilled the well, appellant would not have been obligated to reimburse him or any other person, for these items. The counterclaim asserts they quit because of loss of credit, but Berry testified that he did not quit because of the notice of

forfeiture or posting of the no trespassing sign, but that he quit because of the filing of the suit. Woods testified that he quit because he was informed that appellant had filed its lease. Berry testified that Woods told Berry he couldn't go any further, that they had stopped him and that what stopped Woods was a law suit on file. So, the proof does not sustain the allegations of the counterclaim.

We have referred to various parts of the evidence which was undisputed, because, therefrom it appears to us, that the judgments were against the manifest weight of the evidence. We have referred at length to the evidence, because it must be considered on the charge of conspiracy and slander of title.

Appellees confined their argument to the good faith of appellant in acquiring its lease and discussion of their contention of slander of title. Although appellant cites numerous authorities and argues the privilege of instituting judicial proceedings, which is a well recognized right, we do not deem it necessary to discuss the charge in the complaint of conspiracy in instituting the suit. Apparently, by dismissing the counterclaim against the Allisons and failure of appellees to cite authorities or argue liability for instituting the suit, contention of conspiracy and liability for instituting the suit, were abandoned.

The subject of slander of title has not been extensively considered by our Illinois courts of appeal. In other jurisdictions, however, there appear numerous cases involving the subject, and the general principles seem to be well settled. Our attention has been called to three Illinois cases: — *Van Tuyl v. Riner*, 3 Ill. App. 556; *Inland Printer Co. v. Economical Half Tone Supply Co.*, 99 Ill. App. 8; and *Everett Piano Co. v. Bent*, 60 Ill. App. 372. The *Inland Printer Co.* case involved publication of a libel, in effect, that appellee's wares were humbug, worthless and unfitted for practi-

cal use in the production of half tone pictures. The *Everett Piano Co.* case was for an injunction for a malicious interference with complainant's trade, to stop issuance of a circular claiming that complainant was an infringer and liable to prosecution as such. The issues in those two cases were such that they do not furnish much assistance in the instant case.

Appellees cite several cases, but we do not believe they support their contention. In *Smith v. Autry*, 69 Okla. 28, 169 Pac. 623, notes were fraudulently issued and a warranty deed instead of a mortgage, was placed of record. The evidence showed a definite purchaser ready and able to buy the land, but that he did not do so, because of the deed placed on record. No contention is made in this case, that appellee, Berry, was prevented from selling his lease. The fraud was deliberate in the *Autry* case and was the placing of record of an instrument known to be false.

In *Kelly v. First State Bank*, 145 Minn. 331, 177 N. W. 347 a prospective purchaser, identified, and ready to buy, refused, when he found a second mortgage filed of record by a bank. The bank was told by the mortgagor that he had sold the land to plaintiff and that plaintiff knew of the second mortgage and, although the bank did not consult the purchaser, who was plaintiff, the court held it had the right to rely on the statement, and was not liable. Oil, Inc., a corporation, had the right to rely on the statement of Allison that his lease with appellees had been canceled. In *Collins v. Whitehead*, 34 Fed. 121, the defendant had placed a false affidavit on record which claimed a secret interest and which affected the value of the real estate for which reduced value, damages were claimed.

Appellee places great reliance upon the case of *Humble Oil & Refining Co. v. Kishi* (Tex. Com.), 291 S. W. 538, which they say is stronger than the case at

bar and discussion of the author in Summer's Oil & Gas, vol. 4, pp. 51-54, sec. 600 of said *Kishi* case. Appellees misconstrue the *Kishi* case.

The Supreme Court of Texas, in the case of *Shell Oil Co., Inc. v. Howth*, 159 S. W. (2d) 483 at page 491, distinguishes this *Kishi* case from the *Howth* case and points out, that in the *Kishi* case, the lease expired by its terms and, against the protest of Kishi, the Humble Oil and Refining Company entered the land and drilled a dry hole; that prior to the drilling, the mineral estate had a market value of one thousand dollars per acre and afterward was worthless and said ''The entry . . . without the consent of Kishi constituted a trespass and ouster in denial of Kishi's rights. There was the gravamen of the wrong, and a recovery was based upon that ground . . . The character of the entry made was unlawful, and was the sole cause of the injury complained of.'' The *Kishi* case does not support the contention of Berry and Wood.

*Shell Oil Co. v. Howth* was a suit for cancellation of a mineral lease and for damages claimed by cross action. Among the damages claimed were counsel fees and loss of credit. The court of civil appeals, 133 S. W. (2d) 253, 259-264, held that loss of credit by reason of the false and fraudulent claims advanced by the Shell Petroleum Corp. against the land, are not considered proximate results of the wrong complained of.

In *Shell Oil Co., Inc. v. Howth,* at page 490, the court discusses at detail, and cites many cases in various jurisdictions, on the subject of slander of title. It pointed out that Howth failed to allege in his pleadings the loss of a specific sale or bargain which resulted in the acts complained of and that therefore his pleadings were subject to general demurrer. The defendant there had taken another lease. Consideration of the evidence showed that it acquired rights or

thought it acquired rights. The court stated that it was incumbent on Howth to allege and prove that the Shell Oil Co. was not acting in good faith in purchasing what it believed to be an outstanding title; that the purchased claim was wholly groundless; that it conspired to assert an adverse claim;—that it committed a malicious act. The court pointed out that there was room to doubt as to Howth's title.

We believe the same language applies to this case. The motion by Oil, Inc., a corporation, attacking the counterclaim on the ground it did not state a cause of action should not have been denied. Malice was not averred and malice was not proved. The burden of proof was on counterclaimants to prove a conspiracy and to prove malice. Since Berry and Woods failed to allege a cause of action of slander of title, and failed to prove an unlawful conspiracy against them, or against their title, a judgment in their favor cannot be sustained.

In *Smith v. Michigan Buggy Co.*, 175 Ill. 619, 628, in regard to malicious prosecution of a civil suit, the court pointed out, that, when a civil suit is maliciously prosecuted without probable cause, defendant undergoes expenses and often suffers injury from loss of credit, which wrongs he must endure without a remedy. The court then discussed the right of every man to come into a court of justice and claim what he deems to be his rights, without fear of being prosecuted for heavy damages.

Appellant did not try to take the law in its hands and forcibly take possession of the land, but, with diligence joined the Allisons in the suit to have rights of the various parties determined, in a court of justice. We do not think institution of such suit, under the facts in this case, could be denominated a malicious prosecution, nor a conspiracy. The counterclaim in theory sought damages for loss of credit; but the evidence

showed that their credit was as good as before appellant secured its lease. The court rendered damages, not on the basis of loss of credit, but on certain items of expense which Woods alone would have sustained, without any recourse against the Allisons or appellant, had he continued and drilled the well in question.

An action for slander of title is maintainable only by one who possesses an estate or interest in the the property. 33 Am. Jur. 315, sec. 352. Woods was the contractor. Berry had an interest in the property under his lease. No judgment whatever should have been entered in favor of Woods. Since the elements of the judgment that was rendered for Berry were for expense bills of Woods, irrespective of any other question, such judgment should not have been rendered in favor of Berry. He was not entitled to judgment for the contractor's expenses, although he contracted the bill as agent for the contractor, Woods. That was a matter to settle between themselves.

The decisions all require before liability is occasioned, that the party accused, must have acted maliciously and the fact that he had no claim, in itself, does not establish malice. If he only had reasonable grounds to believe he had an equity or legal title in the lands, assertion of his claim could not be slander of title. *Van Tuyl v. Riner,* 3 Ill. App. 556; 37 C. J. 131, 135, secs. 598, 615, 618; *Ward v. Mid-West & Gulf Co.,* 97 Okla. 252, 223 Pac. 170.

Since the undisputed evidence supports the above, no good purpose would follow by reversing this cause for a new trial.

*Accordingly, judgment is reversed.*